Maroney. Okay. Mr. Maroney. Thank you, Your Honor. May it please the Court, my name is Michael Maroney and I represent the appellant and cross appellee Chevron TCI, which I may refer to as CTCI throughout my argument. There are four contractual payment obligations at issue in these cross appeals. The district court correctly held that Chevron TCI is entitled to two of them, the put price and the special tax distribution, but erred in not awarding CTCI the other two, priority returns and asset management fees. I intend to address these issues in the order they were raised in the district court's decisions on summary judgment and after trial, beginning with the put price and followed with the priority return, special tax distribution and asset management fees. CTCI's entitlement to the put price was resolved on summary judgment. The summary judgment record evidence established that the defendants signed the seventh amendment to the amended and restated purchase agreement, extending the put option deadline until December 31st, 2015, and that CTCI timely exercised that option on November 19th, 2015. The defendants argued that CTCI's exercise of the put option in 2015 was untimely because the put option, they say, expired in 2012. To reach that conclusion, however, the court would have to invalidate five amendments to the amended and restated purchase agreement, which the defendants freely signed, and Judge Jackson correctly declined to do that, noting that Carolyn Martin, on behalf of the manager, read the amendments before signing them and signed not one, not two, not three, but five Likewise, the Wilbur Marvin Foundation, the guarantor in this case, executed five acknowledgments, affirming that the guarantee is in full force and effect after the sale of the hotel. These amendments and the guarantor acknowledgments were not complicated documents. They were a page and a half of text followed by signature pages. The extension of the put option period was front and center on the first page of every one of them and was not buried in some lengthy contract. Importantly, had manager and the Wilbur Marvin Foundation not executed these agreements extending the put option period, CTCI would have executed its put option. Alan Levine, the president of CTCI, testified to that in his declaration on summary judgment at page 10407 of the record. Judge Jackson also expressed a sentiment which I think sums up this entire breach of contract case. He said in his order on summary judgment, defendants do not argue that they did not consent to the agreement, but rather seek to avoid their obligations now that they appear to be dissatisfied with the outcome. On appeal, the defendants advanced two arguments for invalidating the five amendments, the clean hands doctrine and the alleged disillusion of operator. Defendants clean hands defense was premised on the argument that the amendments to the agreement should be rendered absolutely null under Louisiana civil code article 2030. The district court correctly rejected that argument, reasoning that the parties were commercially sophisticated entities, that they willingly signed the agreements and that the agreements were nowhere near the same category of contracts that Louisiana courts have found to be absolutely null. The defendants next argued that the put option period expired on September 5th, 2012 when operator allegedly dissolved, but the district court correctly rejected that argument. And in fact, operator is still in existence today. First, the defendant's lawyer, Gary Elkins, who formed operator, testified at his 30B6 deposition that no action has been taken with the Louisiana Secretary of State to dissolve the company he formed. Second, defendant's in-house counsel, Ty McMains, who is also the company's registered agent, confirmed during his 30B6 deposition in 2019 that the company was still an active entity in good standing with the Louisiana Secretary of State, long after the purported dissolution in 2012. These facts from Mr. Elkins and Mr. McMains in the summary judgment record were also undisputed at trial. They're listed in the pretrial order at the record, page 1827 to 28. Third, Section 2.3C of the First Amendment to the Operating Agreement said the company shall not dissolve. This supersedes Section 2.5 of the Operating Agreement. Fourth are the articles of organization of the company, which were prepared by Mr. Elkins, and say the company can only be dissolved upon the consent of the members, which did not happen. Fifth, we know the put option did not expire because, as I said earlier, we have the five percent purchase agreement, subsequent to the 2012 alleged dissolution. And finally, we have the provisions of the purchase agreement, the operating agreement, and the guarantee, all of which say that managers and the Wilbur Marvin Foundation's obligations to pay the put price are not affected by any purported dissolution of operator. Those provisions are Section 6 of the amended and restated operating agreement, Section 6 of the guarantee, and Section 6 of the disillusionment. And you're still defending the district court's rulings? I am. But your affirmative appeal? I am. Well, for purposes of these cross appeals, and given my time, and I don't expect to be able to get to all of the issues the defendants have raised in my rebuttal, I thought for the sake of the court, I would address them in my opening argument. But you're correct, Your Honor, I am seeking affirmation of the district court's summary judgment decision awarding CTCI the put price. The last provision of the operating agreement, which says that the obligations of the defendants are not affected by the disillusion, purported disillusion, is Section 13.12. So yes, in light of all this evidence, the district court's refusal to find a put option expired on September 5, 2012, when the hotel was sold, was not error. The court's conclusion that the put option was timely exercise should be affirmed, along with a judgment in favor of CTCI on that particular claim. Moving to the priority returns, while the put option gave CTCI a chance to recoup 20 percent of its initial investment in this deal, the priority returns were designed to provide a return on that investment during the life of the investment. On summary judgment, the court held that manager owes CTCI priority returns, but that a trial was necessary to determine for which years and for how much. After trial, the court held that manager does not owe CTCI any priority returns. We contend this was error. We begin with the contractual language, which says priority returns are a cumulative annual distribution payable from cash flow or capital proceeds. But if there is insufficient cash flow or capital proceeds, that does not extinguish the obligation. It doesn't go away. Instead, there are two contractual provisions which are triggered. The manager is to make a project expense loan to the company, which is immediately distributed to CTCI. And, of course, we have the guarantee where Wilbur Marvin Foundation is to pay the priority return under the unconditional and absolute guarantee to provide in this case. I understand or you may have asserted that their internal documents from time to time say that priority returns continue to accrue rather than expire, I guess, would be the opposite. Tell us about that. What internal documents from the other side are there that indicate actually agreement with your position on accrual? Certainly, Your Honor, and importantly, when you look at the contemporaneous record evidence at the time, it was undisputed for 10 years of the party's relationship. For an entire decade, from 2005 to 2015, both sides recognized that CTCI's right to priority returns, even absent positive cash flow, remained. And to answer Your Honor's question, they did this by agreeing in the operating agreement that priority returns were owed even before the hotel opened and began generating cash flow, by actually paying the priority returns in 2006, 2007, 2008, and 2009, by accounting for the priority returns in the audited financial statements of the company and the Wilbur Marvin Foundation, by reflecting the accrual of priority returns in the company's tax returns, and by acknowledging priority returns were owed in communications with CTCI and the accountant at KPMG. So those are the documents, the internal documents, if you will, which, based on the contemporaneous record evidence at the time, show that nobody disputed this obligation until such time as CTCI called it due in 2015. So again, how do you, what's the relevance of the phrase, the contractual phrase, payable from cash flow or capital proceeds? Those are two methods of payment. We say there are four buckets from which those obligations can be paid, and that is two of them. Cash flow, capital proceeds, the project expense loan, and the guarantee. So that's, even absent positive cash flow, as those internal documents reflect, everyone understood this was still an obligation that the defendants would have. And with respect to the guarantee, Sections 1, 3, 6, and 7 unconditionally guarantee payment of those priority returns. The defendant's expert, Mr. Asher, admitted at trial that priority returns were an appropriate accrued liability, owed under generally accepted accounting principles. But in his opinion, because he thought the company was liquidated, he said there was no longer any obligation to pay them because, in his view, you could not, quote, monetize that liability. But it was still a liability, and in fact, we can monetize it because we have an absolute and unconditional guarantee of payment and performance. Having another entity being able to satisfy that obligation is exactly why Chevron TCI got the guarantee when this deal was entered into. With respect to the special tax distribution, on summary judgment, the district court concluded a plain reading of the contract indicates a special tax distribution is owed either from cash flow or capital proceeds or from a project expense loan from manager. The issue for trial was the applicable tax rate used to calculate the special tax distribution. Applicable tax rate is defined as the combined effective federal, state, and local income tax applicable to a member in the fiscal year in which the profits are allocated to the member. CTCI's former president, Nadine Barocca, who had 17 years of experience doing this, testified that the applicable tax rate is 38 percent, representing Applicable effective tax rate or applicable Applicable tax rate, and I'm using that term as I know, but the contract you just read required an effective tax rate, and the testimony that looked to me was more about marginal tax rate. So the issue is not, we contend, what CTCI's effective tax rate was. The issue is not what is their effective tax rate, it is what is the tax rate applicable to them for purposes of calculating a special tax distribution. In other words, the court did not have to decide what the effective tax rate was for CTCI in order to determine what the applicable tax rate was. The contractual language you just read, I mean, it requires it to be the effective tax rate. It says the effect, combined effective rate, applicable to a member. Yes, combined effective rate. Correct. But we know CTCI, in this instance, reports all of its results up to Chevron Corporation. So Chevron Corporation is the one that pays the taxes. It's, CTCI is a subsidiary of Chevron Corporation. Its results are combined with its corporate results. So you're saying the effective tax rate for Chevron, not the subsidiary, effective, not marginal, was 38 percent? The testimony, and I believe this was put forth by the defendant's expert, Mr. Asher, was he calculated their effective tax rate, not marginal, to be 27.85 percent. Oh, okay. Well, then that would not be consistent with what the district court did. Well, the district court sat and listened to Ms. Barocca testify about it being 38 percent and found her testimony to be credible. But was she testifying about an effective tax rate or a marginal tax rate? She was testifying about what the applicable tax rate for purposes of calculating the special tax distribution. She was not making a distinction in that regard between marginal and effective. What was the marginal tax rate? 38 percent. An effective tax rate is always going to be less. I'm not an accountant, but that was the testimony in the record from the accountants, was that the effective tax rate usually would be less than a marginal rate. But as I said, Ms. Barocca, who has calculated this damage award, if you will, as a special tax distribution, many times over her 17 years testified it was 38 percent. We contend this was not clearly erroneous. This was defining a fact that Judge Jackson was entitled to make, sitting and listening to the testimony of all the witnesses. And opposing counsel's position has been what was the effective rate, zero? Well, opposing counsel's position has been that CTCI's effective rate is zero. But to say it's zero also leads to the absurd result that there could never be a special tax distribution because zero times anything is naturally zero. So the issue of trial, though, was what the applicable tax rate was, that's capital A-T-R, and Ms. Barocca's testimony was, as Judge Jackson found credible, and his finding in that regard was not clearly erroneous. I see my time is almost up. I want to touch briefly on the asset management fees. There was no dispute under the agreements that the defendants owed asset management fees of $10,000 per year. The question was for which years? The district court concluded that asset management ceased when the hotel was sold in 2012, but that was premised on the erroneous conclusion that the asset management services CTCI performed related to the hotel. We contend they did not. They were different. CTCI never managed the hotel. That was not its role. And therefore, it's asset management. Your initial time has expired, Mr. McInerney, and you've saved time for a bubble. Thank you. Thank you, Your Honor. Raynaud? Good morning, Your Honors, or maybe it's not morning anymore, I'm sorry. May it please the Court. Good morning, Your Honor. I'm Claude Raynaud. I represent the Appellees and the Cross Appellants, Capital House Hotel Manager, LLC, and the Wilbur Marvin Foundation. Quick glossary of terms. We're going to call Capital House Manager, Manager, Capital House Hotel Operator, LLC, was owned by CTCI and us, we're going to call it Operator, and another entity, Capital House Hotel Development, owned the bricks and mortar. That's all important because there was a lease between operator and owner. Okay? So that's a quick glossary. I'm going to address, Your Honors, questions about special tax distribution. CTCI has taken the position throughout this that you wanted to look at the plain reading of the language of the contracts, and in particular, the operating agreement. The operating agreement controls three of the four buckets of claims. The first claim is the put option, which is under the purchase agreement. Now, it has some language in the operating agreement that I think impacts it, and I'll get to that in a minute, but the other claims are all within the four corners of the operating agreement. So let's look at 6.2C of the operating agreement. That is where special tax distribution is there. First, it says it's the effective tax rate of the member, and investor member is clearly defined as CTCI, which pays zero tax. Putting that aside for a moment, Your Honor, hit on it. Effective tax rate is something different than marginal tax rate. Marginal tax rate is a theoretical tax rate, and their expert, CTCI's expert, defined in his testimony at trial, the effective rate would actually be the rate after tax credits, deductions and so forth. So it could be a typically effective rate is going to be less than the marginal rate. That's their expert defining it. Yet we gloss over that, and I don't know if the district court got that or not, but it is, say, effective rate, and we've stressed that very much. Did you argue to Judge Jackson? Oh, absolutely. And it's 28 percent, or did you only argue zero? Oh, we argued both, because our expert put in, first, there was no evidence of their effective tax rate that they put in. Our expert, Harold Asher, went to SEC quarterly filings and figured out Big Chevron's effective tax rate, and one year was 23 percent, one year was 24 percent, one year was 28 percent. But they didn't put any evidence on that. That's just him extrapolating that from SEC filings. So that's how we got to effective tax rate, but we did argue zero, too. I'm not saying we didn't, because it is member. Now, a couple other things about, while we talk about special tax distribution, CTCI has argued that only profits should be included in the special tax distribution. That's wrong. There's a definition in the definition section, page 18 of the operating agreement, that defines it profits and losses. As you all know, from an accounting standpoint, profit is the net of revenue. And so we believe that you should take into account the losses. In 2012, the year the hotel was sold, the master lease was terminated, and all the FF&A of the operator was sold, they had a net loss of $2.4 million. They had a revenue of four, loss of six, so it's 2.4, about. And so that, with a loss, there should be no special tax distribution. And that's what our expert testified to. We believe that, we hear CTCI say the plain meaning of the contract, by the plain meaning of 6.2c, they should not be entitled to any tax, okay. The big issue for us, presented by the district court, first in the summary judgment motion, and then in the trial itself, was that he didn't concentrate on the language of dissolution that's in the operating agreement. Let me just take you through the chronology here. The put option was in the purchase agreement, as I just said. Between January 1, 2012, and June 30, 2012, or if earlier the date of dissolution, CTCI could have executed the put option. They did not. In June of 2012, the IRS issued what's called a notice of, I can't remember, it's an audit, a NOPA. And as amended on June 28, at CTCI's request, in order to address the NOPA or the audit, they amended the put option cutoff date to the earlier of 8-1-12, or the date of dissolution of the company. That's Joint Exhibit 16. Then, very importantly, on July 24, before October 1, 2012, or if earlier the dissolution of the company, Mr. Allen Levine, who was the president of CTCI at the time, actually left a note to Carolyn Martin, who is our president, saying he may not execute the put on behalf of CTCI. They changed their mind, and they got these two extensions from us. Well, guess what? On September 5, 2012, the hotel was sold to an investment entity out of Ohio. On that date, the master lease was terminated between owner and operator, and it was terminated in a document drafted by Holland and Knight at the direction of Allen Levine, the president of CTCI. Please, you draft it. We want it done right. Terminate that master lease. Also on that date, all of the assets of operator were sold, because that's furnitures, fixtures and equipment, FF&E. We didn't own the bricks and mortar. You're saying dissolution occurred? Yes. But then you've got the third to the seventh amended contract. Correct. But if it's dissolved, we have something in civil law called, as you well know, resolutory conditions, and it is a resolutory condition. If you can do something freely, up until an event, and you can't do it anymore, then that's a resolutory condition, and we put in our affirmative defenses, number seven, that there's no put. There's nothing to put, because they lost their interest. Yes, it was dissolved. 12, colon, 1334, Louisiana Business Corporation Law, says an entity or LLCs, applies to LLCs, is dissolved, is dissolved, and then the affairs wound up. There's also the IRS code, the site that we did, that says the same thing. Liquidation, excuse me, dissolution, then winding it up. Those things, those three through seven, were of no effect in our view. Now that's what we think the court missed. Now insofar as three through seven, we've got to say a few things about that. Carolyn Martin thought she had to do that as tax managing partner of the entity operator, and she did that at the request of Alan Levine. Mr. Levine, in his testimony that was introduced at trial, said he never brought up the fact that priority return would be added on well after the sale of the hotel, and ad infinitum, actually. It went from 1.5 million had they exercised the put before the sale of the hotel, to now it's 10 million, plus 12% interest compounded annually. So it's this huge thing that we were not aware of. And if you're going to do something called a confirmation of, and you know, reconfirm a prior act, you've got to make sure that all the people to the contract know it. Now in Mr. Levine's defense, he didn't think of it either. He said, I just didn't think of that. I bet he didn't know, but we don't know that. So that is where we are with those three through seven. This isn't an unclean hands argument. It's different than clean hands argument. Both sides are trying to do the best they could with the IRS, and I'm not going to accuse CTCI of having unclean hands, and I'm not going to accuse us of having unclean hands. But they were doing it for the IRS. Let's just put it at that. Now, let's go to the WMF guarantee, if I may, for a minute. There's a provision in the WMF guarantee that says adverse consequences will not Well, CTCI is the one that was laying in wait, laying in wait on the priority return. We've cited in the briefs two quotes. One is from Mario Verdinelli, who was a Davis and Polk lawyer, hired to help Holland and Knight with the IRS audit. And he said, prospectively, because he didn't know the hotel had already been sold, well, when the lease is terminated, the IRS may claim we're not entitled to priority return anymore. OK? Even more important, a guy named Justin Albright, who wrote a memo to David Stone, who took over from Alan Levine as president of CTCI, on November 18, 2015. And what he said then was, all rights under the future rights for CTCI under the option agreement have been terminated because the lease will be extinguished because the lease is terminated. That's pretty compelling. Dave Stone wrote concur. Next day, they sent the put notice. And let's just say, we were shocked when we got the put notice. We had no idea they would be accumulating priority return. So the district court allowed Carolyn Martin to testify about this because of the impact it had on priority return. They had the Alan Levine testimony that just never came up. I didn't think of it. Well, that's the biggest number of the whole case, which we prevailed on. And I think Judge Jackson got it because it's just, I'll tell you a perfect example in the trial. I asked Miss Barocca over and over again, show me in the documents where priority return goes forever. She couldn't do it. And so finally said, Mr. Reno, stop beating that dead horse. And I did. But the horse was dead. Their excuse for priority return is twofold. One, they say in the purchase agreement, not the operating agreement, in section 2D, that it says the put price shall be, the put price itself, and any unpaid priority return, special tax distribution, and asset management. Any. That's noncommittal. I mean, may not be any. And so it doesn't prove their case. The second is footnotes that were dropped into audits, historic footnotes, that were dropped into audits that were done every year during the time the company operated. So these are footnotes referred to a priority return being owed. But for the cash flow issue, which was always negative, we would owe priority returns before the hotel was terminated. And they extrapolated that. The accountants took that out to 2015, I guess. And that's just a mistake by the accountants. But it doesn't mean that we agreed to that. In fact, we didn't even know about it until we got the put price. So that's the priority. Oh, no, I've still got a little time. That's really it. Do you all have any questions? All right. Thank you very much. Mr. Aroni for rebuttal. Thank you, Your Honor. Just to address a couple of things that Mr. Raynaud raised. With respect to losses, Section 6.2C only speaks to profits with a capital P. There's no standalone definition of profits in the operating agreement. There is a definition of, quote, profits or losses.  Losses need to be taken into account because he assumed incorrectly that there was a liquidation of the company. Chevron TCI's asset manager, Ms. Villaraza-Steele, testified that the income allocated to Chevron TCI for purposes of calculating the special tax distribution is not offset by losses. You look at the Schedule K1, boxes 1 and 10, which is in the record at page 5031. They refer to income and loss in parentheses, and there's positive numbers in both boxes. Those are the figures we used. That's what the testimony was. With respect to the 27.85%, Mr. Asher again did some math and determined that that was, in his opinion, the effective tax rate of Chevron Corporation. Mr. Terrio, our expert, then ran an alternative calculation, and this was in the record at page 3691, of what the special tax distribution would be using that rate. And it was a little over $2 million. So there was evidence in the record, if one were to accept that as the effective tax rate of Chevron Corporation, as to what the special tax distribution would be. With respect to disillusion, disillusion is not self-executing. The company did not turn into a pumpkin on September 5th, 2012. It continued to exist at most. The sale commenced the process for a legal disillusion or termination. And the best case for that, your honor, is Gamble versus Tullis, cited on page 16 of our response and reply brief. It is our understanding the Louisiana Supreme Court has not spoken on this. But there are steps for disillusion outlined in Gamble, and the managing member of the LLC is required to take those steps in order to effectuate a disillusion. It's undisputed. The manager in this case never took those steps. With respect to the resolutory condition point, this was a point raised, I believe, for the first time in the defendant's reply brief. And I have two responses to that. First, the company did not dissolve. And second, the events of disillusion the defendants point to are not resolutory conditions. A resolutory condition is something that operates automatically to annul or terminate a contract. They cite to the city of Harahan case in their brief, in their reply brief, and other cases, each of which expressly stated that the contract shall be null and void under the resolutory condition. We don't have that here. To the contrary, section eight of the amended and restated purchase agreement said it may not be terminated except by a written agreement between the purchaser and the investor member. In section four of every one of the five amendments that followed the alleged disillusion said the purchase agreement remains in effect except to the extent amended hereby. So the purchase agreement did not automatically become null and void. The parties were free to enter into the subsequent amendments and they did that. This idea that Ms. Martin and Mr. Levine exchanged emails and correspondence about why the amendments to the purchase agreement were entered into. Be that as it may, for one, none of that matters why they did it. She did it. She freely did it. She acknowledged that. I think Judge Jackson acknowledged that in his opinion, actually acknowledged that repeatedly throughout the course of motions in limine and again in trial. And again, importantly, as Mr. Levine testified, if the manager had not agreed to extend the put option, CTCI would have exercised this put option rather than allow it to expire. The reason the put priority return is such a big number now, your honors, is because the defendants didn't pay it in 2015. It was a much smaller number then, as reflected in, I believe it's joint exhibit 15, it's the election notice. It's the notice we sent in November of 2015 that says we are hereby exercising our put option and here are the numbers that you owe. And at that point, almost eight years ago, it was a much smaller number. And the reason it's large now is because it's 12% interest. So thank you, your honor, I see I'm out of time. Thank you. Ronnie, your case and all of today's cases are under submission and the court is in recess until 9 o'clock tomorrow.